IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


UPMC-BRADDOCK HOSPITAL,     )
         Plaintiff,        )
                     )
       vs.             )     Civil Action No. 07-1618
                     )
MICHAEL O. LEAVITT, as the Secretary     )
of the United States Department of Health     )
and Human Services,     )
         Defendant.        )

## MEMORANDUM OPINION

Plaintiff, UPMC-Braddock Hospital ("UPMC-Braddock"), brings this action pursuant to the Administrative Procedures Act, 5 U.S.C. §§ 551-59 (APA), and the applicable provisions of the Medicare Act and regulations, 42 U.S.C. § 1395$oo$f(1), 42 C.F.R. § 405.1877, seeking review of the final decision of the Defendant, Michael O. Leavitt, Secretary of Health and Human Services ("Secretary"), denying its Medicare reimbursement claims for depreciation-related losses that allegedly occurred during the statutory merger of Braddock Medical Center ("BMC") and UPMC-Braddock, with UPMC-Braddock as the sole surviving corporation. The merger occurred on November 30, 1996.

Presently before this Court for disposition are cross-motions for summary judgment. For the reasons that follow, Plaintiff's motion will be denied and Defendant's motion will be granted.

Facts

Prior to the transaction at issue in this case, BMC was a non-profit corporation operating an acute care inpatient hospital of the same name. On November 30, 1996, BMC, its parent company (Heritage Health System), and Heritage Health Foundation signed an agreement to merge BMC into UPMC-Braddock, with UPMC-Braddock as the surviving corporation. (A.R.

1098-1121.)[1]  Heritage Health Foundation ("Foundation") was a non-profit subsidiary of Heritage Health System formed in 1983.  (A.R. 1243.)  The Foundation undertook fund raising and other charitable activities primarily for the benefit of BMC.  (A.R. 110.)  The surviving corporation after the merger, UPMC-Braddock, was a non-profit corporation created by the University of Pittsburgh Medical Center System ("UPMCS") as a vehicle for the merger.  The sole member (i.e. the equivalent of sole shareholder in a stock corporation) of UPMC-Braddock was UPMCS.  (A.R. 1100-01.)  According to the terms of the merger agreement, the board of directors of UPMC-Braddock would consist of 6 members appointed by the Foundation and 12 members appointed by UPMCS.  (A.R. 1107.)

The merger agreement further provided for a period of 3 years during which UPMCS would be unable to amend the bylaws to restrict the Foundation's right to appoint members to UPMC Braddock's board of directors without the vote of a majority of Foundation appointed directors.  (A.R. 1107.)  UPMC-Braddock would be further unable to (1) sell or transfer all or substantially all of UPMC-Braddock's assets, (2) merge UPMC-Braddock into another corporation, (3) dissolve UPMC-Braddock, or (4) reduce clinical services other than as agreed to in a Development Plan created pursuant to the merger agreement without express written consent of the Foundation.  (A.R. 1107-09.)  The merger agreement also provided that the Chairman of BMC would become the Chairman of UPMC-Braddock.  (A.R. 1108.)  UPMCS gained the right to appoint two members to the Foundation's board of directors.  (A.R. 1109.)  In a side agreement, the Foundation agreed to provide $3,000,000 of funding to UPMC-Braddock.  (A.R. 117-27, 1228-38.)

_____

[1]      Docket Nos. 21-26.

Mr. Thomas E. Boyle, an attorney and shareholder in the law firm Buchanan Ingersoll, filed a Declaration and Affidavit which became part of the administrative record that the merger was agreed to in order to "better achieve charitable purposes, allow BMC to develop enhanced clinical capabilities with UPMCS, permit BMC a more efficient and cost effective rationalizing of healthcare services, restrain increases in the cost of services and support increased managed care opportunities." (A.R. 760.) Mr. Boyle further declared that the merger had been successful in achieving those objectives. (A.R. 763.)

In accordance with the merger agreement, BMC transferred both its assets and its liabilities to UPMC-Braddock. Prior to executing the merger agreement, BMC did not conduct any appraisal to determine the fair market value of the assets being transferred. After the merger, an appraisal was conducted to determine the assets' fair market value for purposes of allocating consideration and calculating BMC's purported loss. (A.R. 352-678.)

Pursuant to the merger, UPMC-Braddock received approximately $24 million in assets from BMC and a $3 million obligation from the Foundation. (A.R. 27-29; 117-27; 246; 1112.) These $27 million in assets included monetary assets in excess of $13 million ($10,374,732 from BMC and $3 million from the Foundation). The "loss" calculation that UPMC Braddock submitted to the intermediary as a justification for its request for additional depreciation payments shows that BMC had $10,374,732 in monetary assets and $12,910,190 in debt. (A.R. 246.) The "loss" calculation also shows that BMC's land, land improvements, buildings, and equipment were subsequently appraised as being worth $13,325,000 at the time of the merger. Thus, through the merger UPMC Braddock received these assets worth $23.7 million, plus the additional $3 million from the Foundation, for the purported consideration of assuming

$12,910,190 in debt.  The Administrator concluded that UPMC-Braddock acquired approximately $27 million in assets, including monetary assets in excess of $13 million, for the assumption of slightly less than $13 million in debt.  (A.R. 27-28.)  The record also demonstrates that while the provider claimed a loss on the "sale," the appraised fair market value of its depreciable assets (equipment and buildings) of approximately $13 million was several million dollars more than the Medicare net book value for those assets of $9.7 million.  (A.R. 246.)  In other words, the record clearly shows that the Medicare depreciation schedule had in fact over-estimated the rate at which the hospital's assets had depreciated and had, consequently overpaid the hospital for depreciation.

Defendant argues that, in calculating the Medicare reimbursement effect of the merger, UPMC-Braddock offers several different allocation methodologies.  (A.R. 244-56.)  Because UPMC-Braddock acquired cash and cash equivalents that exceeded BMC's debt, an allocation of the "consideration" in accordance with Medicare rules, i.e. first to cash and cash equivalents on a dollar-for-dollar basis ($13 million in cash for less than $13 million in debt), there is no consideration left over to allocate to depreciable assets (i.e., building and equipment).  Plaintiff suggests that this method of allocation should be accepted as resulting in a loss of $7.2 million.  (A.R. 246.)  Despite the fact that BMC's non-financial assets (land, land improvement, equipment, and buildings) were appraised at $13,325,000, at or about the time of transfer, UPMC-Braddock treats the absence of consideration paid for the depreciable assets as evidence that the assets had depreciated to nothing.  UPMC-Braddock therefore claimed a near total "loss" with respect to them and asked Medicare to reimburse its share of that loss through a depreciation adjustment.  42 C.F.R. § 413.134(f).  (A.R. 244-246.)

The fiscal intermediary ("FI") audited BMC's closing cost report and, by letter dated August 3, 1999, disallowed the claimed loss in full. (A.R. 2043.) BMC subsequently appealed the FI's decision to the Provider Reimbursement Review Board ("PRRB") as prescribed by the Medicare stature. 42 U.S.C. § 1395$oo$(a). On March 20, 2006, the PRRB held a hearing, at which Plaintiff submitted testimony and evidence from multiple witnesses. (A.R. 719-52.) On July 31, 2007, the Board issued a decision in the hospital's favor. (A.R. 47-56.)

The CMS Administrator, on behalf of the Secretary, reviewed and, in an opinion dated September 27, 2007, reversed the PRRB's decision and affirmed the FI's disallowance of the loss. (A.R. 2-30.) 42 U.S.C. § 1395$oo$(f)(1). The Administrator found that the discrepancy between the value of the transferred assets and the consideration received for them (i.e. transferring a $13 million hospital for free) indicated the absence of a bona fide sale; the Administrator further concluded that BMC's significant participation in the governance of UPMC-Braddock (the appointment of one third of UPMC-Braddock's Board of Directors and the continued role of BMC's Chairman) rendered them "related parties," thereby disallowing the use of the "sale price" as the fair market value of the hospital. The Administrator's decision became the final decision of the Secretary. UPMC-Braddock subsequently filed this appeal.

Procedural History

Plaintiff filed this action on November 27, 2007. On January 14, 2008, the parties consented to have the matter handled by a magistrate judge and on January 15, 2008, the matter was referred to the undersigned for all proceedings pursuant to 28 U.S.C. § 636(c). On March 13, 2008, Defendant filed an answer to the complaint and a certified copy of the transcript of the administrative record of the proceedings in this case (Docket Nos. 20-26). On May 15, 2008,

Plaintiff filed a motion for summary judgment. On June 16, 2008, Defendant filed a motion for summary judgment.

<u>Standards of Review</u>

Summary judgment is appropriate if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. <u>Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. <u>Anderson v. Liberty-Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

Under the Social Security Act, judicial review of a final administrative decision is governed by the APA, which provides for judicial review of agency decisions and is limited to "a determination of whether the agency action, findings and conclusions are arbitrary, capricious, and an abuse of discretion or otherwise not in accordance with law or unsupported by the evidence." 5 U.S.C. § 706(2)(A). The agency's decision must be supported by "substantial

evidence," which is "more than a mere scintilla. It means such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion." Mercy Home Health v. Leavitt, 436

F.3d 370, 380 (3d Cir. 2006) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). The

burden of proof falls on the provider. Id.

> With respect to Medicare regulations, the Supreme Court has held that courts:

> must give substantial deference to an agency's interpretation of its own
> regulations. Our task is not to decide which among several competing
> interpretations best serves the regulatory purpose. Rather, the agency's
> interpretation must be given controlling weight unless it is plainly erroneous or
> inconsistent with the regulation. In other words, we must defer to the Secretary's
> interpretation unless an alternative reading is compelled by the regulation's plain
> language or by other indications of the Secretary's intent at the time of the
> regulation's promulgation. This broad deference is all the more warranted when,
> as here, the regulation concerns "a complex and highly technical regulatory
> program," in which the identification and classification of relevant "criteria
> necessarily require significant expertise and entail the exercise of judgment
> grounded in policy concerns." Pauley v. BethEnergy Mines, Inc., 501 U.S. 680,
> 697, 111 S.Ct. 2524, 2534, 115 L.Ed.2d 604 (1991).

Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994) (other citations omitted).

> Overview of the Regulations

Under the Medicare Act, the Secretary reimburses hospitals for the reasonable cost of

providing covered health care services to Medicare patients. 42 U.S.C. § 1395f(b)(2).

Reasonable cost means "the cost actually incurred," excluding anything unnecessary for the

efficient delivery of needed health services, and determined in accordance with the Secretary's

regulations. 42 U.S.C. § 1395x(v)(1)(A).

The Secretary has promulgated extensive regulations for determining reasonable cost

reimbursement. Shalala v. Guernsey Mem. Hosp., 514 U.S. 87, 92 (1995). Among other things,

an appropriate allowance for depreciation on buildings and equipment used in the provision of

patient care is an allowable cost.  42 C.F.R. § 413.134(a) (1995).[2]  The portion of such

depreciation expense borne by Medicare is based in part on the degree to which the assets have

been used to serve Medicare beneficiaries.

Fair market value "is the price that the asset would bring by bona fide bargaining between

well-informed buyers and sellers at the date of acquisition.  Usually the fair market price is the

price that bona fide sales have been consummated for assets of like type, quality, and quantity in

a particular market at the time of acquisition."  42 C.F.R. § 413.134(b)(2).  See also Provider

Reimbursement Manual ("PRM"), Ch. 1, § 104.15 (A.R. 690).

The system of providing reimbursement for depreciable assets results in those assets

having a "net book value" for Medicare purposes, which is typically the historical cost of the

asset less depreciation previously paid to the provider.  See 42 C.F.R. § 413.134(b)(9). Under the

Secretary's regulations, when a hospital disposes of a depreciable asset for more or less than its

net book value, "an adjustment is necessary in the provider's allowable cost ."  § 413.134(f).  For

example, when an asset is sold for more than book value, the provider is considered to have

incurred a gain on the asset, and the Secretary can "recapture" from this gain depreciation

payments previously made.  Conversely, if the provider sells the asset for less than book value,

the provider is considered to have incurred a loss, and the Secretary provides additional

reimbursement to the provider.  See 44 Fed. Reg. 3980 (1979) ("[I]f a gain or loss is realized

from the disposition, reimbursement for depreciation must be adjusted so that Medicare pays the

---

[2]  In 1997, Congress amended section 1861 of the Social Security Act, 42 U.S.C.
§ 1395x(v)(1)(O)(i), by setting the asset's value equal to the owner's historical cost less
depreciation allowed, thereby eliminating the possibility of gains or losses resulting from asset
disposals after August 5, 1997.  However, this amendment did not affect the merger in this case,
which had an effective date of November 30, 1996.

actual cost the provider incurred in using the asset for patient care."); 42 U.S.C. § 1395x(v)(1)(A) (1995) (the Secretary shall provide for suitable retroactive corrective adjustments where the aggregate reimbursement produced by methods of determining costs proves to be either inadequate or excessive).

The primary regulation at issue here is 42 C.F.R. § 413.134 (1995), concerning "allowance for depreciation based on asset costs." A subsection of the regulation dealing specifically with gains and losses upon disposal of depreciable assets provided in part that "depreciable assets may be disposed of through sale, scrapping, trade-in, exchange, demolition, abandonment, condemnation, fire, theft or other casualty." § 413.134(f)(1). If such disposal resulted in a gain or loss, "an adjustment is necessary in the provider's allowable cost." The treatment of the gain or loss "depends upon the manner of the disposition of the asset, as specified in paragraphs (f)(2) through (6) of this section." Subsection (f)(2), entitled "Bona fide sale or scrapping," provided in part that gains and losses realized from "the bona fide sale" of depreciable assets were included in allowable costs while the provider is participating in Medicare.

The provision at the heart of the current dispute, § 413.134(*l*), was entitled "Transactions involving a provider's capital stock."[3] It addressed three particular types of transactions: (1) the acquisition of a provider's capital stock; (2) a statutory merger; and (3) a consolidation. The second subsection, on statutory mergers, noted that a merger was a combination of two or more corporations, with one of the corporations surviving and acquiring the assets and liabilities of the merged corporation by operation of law. § 413.134(*l*)(2). This subsection drew a distinction as

---

[3]     42 C.F.R. § 413.134(*l*) was redesignated as 42 C.F.R. § 413.134(k) in 2002.

to mergers between unrelated parties and those between related parties.  If the parties to the merger were unrelated (as defined in § 413.17), the assets of the merged corporation acquired by the surviving corporation "may be revalued in accordance with paragraph (g) of this section," and "[i]f the merged corporation was a provider before the merger, then it is subject to the provisions of paragraphs (d)(3) and (f) of this section concerning recovery of accelerated depreciation and the realization of gains and losses.  The basis of the assets owned by the surviving corporation are unaffected by the transaction." § 413.134(*l*)(2)(I).

Section 413.17, referenced in subsection (*l*) above, was entitled "Cost to related organizations."  It provided generally that "costs applicable to services, facilities, and supplies furnished to the provider by organizations related to the provider by common ownership or control are includable in the allowable cost of the provider at the cost to the related organization," but are not to exceed the price of comparable such items that could be purchased elsewhere.  42 C.F.R. § 413.17(a).  It also defined "related to the provider" to mean "that the provider to a significant extent is associated or affiliated with or has control of or is controlled by the organization furnishing the services, facilities, or supplies."  § 413.17(b)(1).  Further, "common ownership exists if an individual or individuals possess significant ownership or equity in the provider and the institution or organization serving the provider," and "control exists if an individual or an organization has the power, directly or indirectly, significantly to influence or direct the actions or policies of an organization or institution."  § 413.17(b)(2) & (b)(3).

Plaintiff's Arguments

Plaintiff argues that: 1) the Administrator's interpretation of the term "between two or more corporations" in the regulation relating to gains and losses from consolidations as

potentially referring to the pre-merger and post-merger entities is clearly inconsistent with the unambiguous language of the regulation, which can only refer to the parties to the merger and cannot include the corporation that results therefrom, and thus the Administrator's interpretation is not entitled to any deference; 2) the Administrator's new policy represents a fundamental change in CMS's previous interpretation of the regulations and a retroactive application, and such change can only be implemented after satisfaction of the notice and comment requirements of the APA, 5 U.S.C. § 553 (which did not occur), and the Administrator cannot rely on an unpublished policy to the detriment of providers who are unaware of it; 3) no substantial evidence exists in the record to support the Administrator's conclusion that BMC and UPMC-Braddock are "related parties" and conversely substantial evidence demonstrates that this is not the case; 4) the Administrator erred in concluding that the transaction was not a bona fide sale because there is no evidence supporting the position that the net book value of assets is an appropriate measure of fair market value; and 5) the PRRB's decision to require inclusion of an additional $3 million of consideration in loss calculation was erroneous.

Defendant's Arguments

Defendant argues that: 1) Plaintiff may not claim a loss because the merger did not meet the criteria for a "bona fide sale"; and 2) Plaintiff may not claim a loss because the merger was a "related party" transaction. Because Defendant's argument concerning the lack of a bona fide sale is availing, the Court need not address the alternative argument concerning whether the transaction involved related parties.

Bona Fide Sale Requirement

As explained above, Medicare regulations provide that:

Statutory merger.  A statutory merger is a combination of two or more corporations under the corporation laws of the State, with one of the corporations surviving.  The surviving corporation acquires the assets and liabilities of the merged corporation(s) by operation of State law.  The effect of a statutory merger upon Medicare reimbursement is as follows:

(i) Statutory merger between unrelated parties. If the statutory merger is between two or more corporations that are unrelated (as specified in § 413.17), the assets of the merged corporation(s) acquired by the surviving corporation may be revalued in accordance with paragraph (g) of this section.  If the merged corporation was a provider before the merger, then it is subject to the provisions of paragraphs (d)(3) and (f) of this section concerning recovery of accelerated depreciation and the realization of gains and losses.  The basis of the assets owned by the surviving corporation are unaffected by the transaction.  An example of this type of transaction is one in which Corporation A, a nonprovider, and Corporation B, the provider, are combined by a statutory merger, with Corporation A being the surviving corporation.  In such a case the assets of Corporation B acquired by Corporation A may be revalued in accordance with paragraph (g) of this section.

(ii) Statutory merger between related parties.  If the statutory merger is between two or more related corporations (as specified in § 413.17), no revaluation of assets is permitted for those assets acquired by the surviving corporation.  An example of this type of transaction is one in which Corporation A purchase the capital stock of Corporation B, the provider.  Immediately after the acquisition of the capital stock of Corporation B, there is a statutory merger of Corporation B and Corporation A, with Corporation A being the surviving corporation.  Under these circumstances, at the time of the merger the transaction is one between related parties and is not a basis for revaluation of the provider's assets.

42 C.F.R. § 413.134(*l*)(2) (1995).

On October 19, 2000, CMS issued Program Memorandum ("PM") A-00-76 to its contractors, which addresses the issue of the recognition and reimbursement of depreciation-related losses on the sale of assets.  The PM states that, because nonprofit entities have different motivations than for-profit entities, special considerations have to be regarded in applying the regulations to nonprofit mergers and consolidations.  (A.R. 2009.)  The PM has two parts.  First, it requires examination of whether members of the pre-consolidation hospital board of directors and management team continued in office after the consolidation, because if significant

representation from the previous board or management team continues to exist in the new board or management team, no real change of control has occurred.  Second, with respect the issue of bona fide sale, the PM provides that:

> Notwithstanding the treatment of the transaction for financial accounting purposes, no gain or loss may be recognized for Medicare payment purposes unless the transfer of the assets resulted from a <u>bona fide</u> sale as required by regulation 413.134(f) and as defined in the PRM at 104.24.  The regulations at 42 CFR 413.134(*l*) do not permit recognition of a gain or loss resulting from the mere combining of multiple entities' assets and liabilities without regard to whether a <u>bona fide</u> sale occurred.

> ... for Medicare payment purposes, a recognizable gain or loss resulting from a sale of depreciable assets arises after an arm's-length business transaction between a willing and well-informed buyer and seller.  An arm's-length transaction is a transaction negotiated by unrelated parties, each acting in its own self interest in which objective value is defined after selfish bargaining.  However, frequently this is not the environment that brings non-profit entities together through merger or consolidation.

> As with for-profit entities, in evaluating whether a <u>bona fide</u> sale has occurred in the context of a merger or consolidation between or among non-profit entities, a comparison of the sales price with the fair market value of the assets acquired is a required aspect of such analysis.  As set forth in PRM 104.24, reasonable consideration is a required element of a <u>bona fide</u> sale.  Thus, a large disparity between the sales price (consideration) and the fair market value of the assets sold indicates the lack of a <u>bona fide</u> sale.  With regard to non-profit mergers or consolidations, often the sales price consists of assumed debt only, but may also include cash and/or new debt....

> Moreover, in analyzing whether a <u>bona fide</u> sale has occurred, a review of the allocation of the sales price among the assets sold is appropriate.  In some situations, the "sales price" of the assets may be barely in excess of, or less than, the market value of the current assets sold, leaving a minimal, or no, part of the sales price to be allocated to the fixed (including the depreciable) assets.  In such a circumstance, effectively the current assets have been sold, and the fixed assets have been given over at minimal or no cost.  If a minimal or no portion of the sales price is allocated to the fixed (including the depreciable) assets a <u>bona fide</u> sale of those assets has not occurred....

(A.R. 2010-11.)

Plaintiff argues that Medicare regulations do not require arm's length bargaining or fair market value to generate a revaluation of assets affected by a corporate consolidation between unrelated parties and they contend that the Secretary's conclusion that the transaction was not bona fide is not supported by substantial evidence. Defendant responds that the consolidation did have to meet the requirements for a bona fide sale and that substantial evidence in the record supports the Secretary's conclusion that the transaction did not in this case.

As cited in the PM, the PRM states that:

A bona fide sale contemplates an arm's length transaction between a willing and well informed buyer and seller, neither being under coercion, for reasonable consideration. An arm's length transaction is a transaction negotiated by unrelated parties, each acting in its own self interest.

PRM, Ch. 1, § 104.24 (A.R. 1951).

Plaintiff suggests that 42 C.F.R. § 413.134(*l*) creates a new rule under which transactions that do not qualify under subsection (f) may nevertheless recognize gain or loss. Defendant observes that the Court of Appeals for the Tenth Circuit recently rejected this very argument:

If, as the Secretary argues, any depreciation adjustment under § 413.134(*l*)(3)(I) must occur pursuant to § 413.134(f), and if, as St. Joseph [the provider] argues, the "bona fide sale" requirement is inapplicable to consolidations because they are not "sales," then St. Joseph automatically loses, because a consolidation would satisfy none of the other provisions of § 413.134(f) permitting a depreciation adjustment. The Secretary, however, is willing to allow depreciation adjustments in at least some consolidations, and the treatment of consolidations in the same vein as "sales" under § 413.134(f) is a reasonable way to accomplish that.

Via Christi Regional Med. Ctr., Inc. v. Leavitt, 509 F.3d 1259, 1275 n.14 (10th Cir. 2007).

Thus, the only way that Plaintiff may recognize a loss is through a bona fide sale. Moreover, the court in Via Christi concluded that the Secretary's definition of "bona fide sale" to include arm's length bargaining and reasonable consideration is reasonable and entitled to

deference:

The "bona fide sale" requirement is a reasonable construction of 42 C.F.R. § 413.134(*l*)(3)(I), supported by the text of the regulations. Section 413.134(f) is the *only* section expressly permitting depreciation adjustments and defining the exact circumstances under which a provider can seek such an adjustment. Several other sections refer to it directly for this purpose. For instance, § 413.130 alludes to § 413.134(f) for determining any depreciation adjustments under the regulations: "Capital-related costs and an allowance for return on equity are limited to the following: (1) Net depreciation expense as determined under §§ 413.134, 413.144, and 413.149, *adjusted by gains and losses realized from the disposal of depreciable assets under § 413.134(f)*." 42 C.F.R. § 413.130(a) (emphasis added). Likewise, § 413.134(*l*)(2)(I) references § 413.134(f) as "concerning recovery of accelerated depreciation and the realization of gains and losses" in the statutory merger context. If the Secretary is going to construe § 413.134(*l*)(3)(I) as permitting depreciation adjustments for consolidations, then the Secretary is perfectly reasonable in maintaining consistency and only allowing depreciation adjustments that comply with § 413.134(f)....

Compliance with § 413.134(f) is also consistent with interpretive materials that the Secretary issued both before and after the consolidation in the instant case....

Of the disposals of depreciable assets listed in § 413.134(f), the only one that would apply here is the "bona fide sale" of § 413.134(f)(2), and the Secretary has reasonably interpreted it as applying in this case. The Secretary originally provided for depreciation adjustments under § 413.134(f) because the yearly "reasonable cost" depreciation reimbursements only approximated economic reality. See 44 Fed. Reg. at 3,980. In theory, at least, a "bona fide sale" under § 413.134(f) provided an objective measurement of an asset's worth, allowing both the Secretary and the provider to calculate the actual depreciation incurred to that point-and meriting an adjustment to previous depreciation payments. See id. Even if a consolidation or statutory merger is not a "sale" per se, treating it as a sale pursuant to § 413.134(f)(2) ensures that any depreciation adjustment will represent economic reality, rather than mere "paper losses."

Additionally, the Secretary's definition of a "bona fide sale" in this context is reasonable and entitled to deference. In the instant case, the Secretary explained that a "bona fide sale" includes (1) "arm's length bargaining, [including] an attempt to maximize any sale price," and (2) reasonable consideration. This definition is consistent with the regulations and early interpretive materials. See 42 C.F.R. § 413.134(b)(2) (defining "fair market value" as "the price that the asset would bring by bona fide bargaining between well-informed buyers and sellers at the date of acquisition," and explaining that

"[u]sually the fair market price is the price that bona fide sales have been consummated for assets of like type, quality, and quantity in a particular market at the time of acquisition"); Jan. 11, 1989, Memorandum; see also N. Iowa Med. Ctr. v. Dep't of Health & Human Servs., 196 F. Supp. 2d 784, 787 (N.D. Iowa 2002) ("Under 42 C.F.R. § 413.134(f), a sale of depreciable assets is bona fide if (a) fair market value is paid for the assets, and (b) the sale is negotiated (I) at arms' length (ii) between unrelated parties.")....

Id. at 1274-76 (footnotes and some citations omitted). See also Robert F. Kennedy Med. Ctr. v. Leavitt, 526 F.3d 557, 562-63 (9th Cir. 2008) (following Via Christi); Lehigh Valley Hosp.-Muhlenberg v. Leavitt, 253 Fed. Appx. 190, 194-95 (3d Cir. 2007) (even if PRRB relied on PM A-00-76 to determine what constitutes a bona fide sale in a non-profit context, such reliance was reasonable when it merely clarified an existing rule and explicitly stated that it did not include any new policies); Jeanes Hosp. v. Leavitt, 453 F. Supp. 2d 888, 903 (E.D. Pa. 2006) (same).

Plaintiff points to testimony by Robert DeLuca regarding the appropriateness of the assumption of liabilities as a form of consideration:

Q:      Was there any requirement in the applicable Medicare regulations of this transaction prohibiting a recognition of loss if the consideration was the assumption of liabilities?

A.      No, not at all.  In fact, in the Booth letter, the given assumed facts were that the purchase price was assumed liability and Mr. Booth, you know, felt that that was fine.  He did not, you know, indicate any kind of problem or concern with that.

(A.R. 738.)

Defendant responds that the meaning of regulations is a pure question of law and is not a proper subject for expert testimony, especially the testimony of experts retained as consultants to a provider and the Administrator properly gave no weight to it.  In addition, it notes that this testimony cannot be reconciled with the plain language of 42 C.F.R. § 413.130(a), which expressly limits the recognition of gains and losses to the disposals of assets listed in

§ 413.134(f).

Courts which have addressed this issue have found that the Secretary's reliance on the Program Memorandum to clarify that a statutory merger must meet the requirements of a bona fide sale in order to qualify for reimbursement is reasonable, is supported by the text of the regulations and is entitled to deference. Plaintiff has cited no authority to the contrary. Thus, it has not demonstrated that the Secretary's interpretation is plainly erroneous or inconsistent with the regulation and therefore the Court must give it controlling weight. Therefore, the merger must have met the requirements of a bona fide sale or the loss will not be recognized.

In <u>Via Christi</u>, the court determined that substantial evidence justified the Secretary's finding that no "bona fide sale" occurred:.

> reasonable consideration was notably absent from the transaction, and the economic case for revaluing the depreciable assets was highly questionable. In the "bona fide sale" context, the reasonable consideration inquiry involves determining whether the provider received fair market value for its assets. In the instant case, neither St. Joseph nor the Secretary conducted an appraisal of the assets' fair market value....

509 F.3d at 1276. The court declined to remand the case for a determination of fair market value because St. Joseph had the burden of showing that the transaction fit within § 413.134(f)'s bona fide sale provision and had failed to do so. In addition,

> no evidence suggests that a remand would change the result in this case. Even assuming the book value of St. Joseph's depreciable assets did not equal their fair market value, St. Joseph's cash and cash equivalents were $3.7 million, with total current assets at $29 million. As noted, the consideration for the transaction (Via Christi's assumption of St. Joseph's liabilities) was only $26.1 million. Absent some record evidence to suggest that the current assets were impaired or worth significantly less, it seems purely speculative to remand to determine why St. Joseph would have sold its current assets at a material discount and its depreciable Medicare assets for nothing. As PM A-00-76 explains, "the sales price (assumed liabilities) is allocated first to the cash, cash equivalents, and other current assets," so in situations where the current assets are worth more than the assumed

> liabilities, "effectively the current assets have been sold, and the fixed assets have been given over at minimal or no cost." PM A-00-76, at 4 (Example 3). In such a situation, "[b]ecause no part of the purchase price was allocated to the fixed assets, a <u>bona fide</u> sale of those assets has not occurred and Medicare would not recognize a loss as a result of the transaction." <u>Id.</u> Regardless of the fair market value of St. Joseph's depreciable assets, the consolidation at issue did not involve the reasonable consideration that a "bona fide sale" would produce, and St. Joseph is not entitled to Medicare reimbursement for a depreciation adjustment.

<u>Id.</u> at 1277 (footnote omitted). <u>See also</u> <u>RFK</u>, 526 F.3d at 563 (when RFK transferred approximately $50 million in assets for $30.5 million in consideration from CHW-SC in merger, and CHW-SC paid almost nothing for RFK's hospital buildings and equipment despite their appraised value of approximately $12 million, the Administrator properly concluded that the transaction lacked reasonable consideration, and the Administrator also concluded that RFK did not attempt to obtain "fair market value" for its assets); <u>Lehigh Valley</u>, 253 Fed. Appx. at 196-97 (PRRB appropriately concluded that transaction–in which the buyer assumed Muhlenberg's liabilities of $43,748,442 and paid for the transaction costs of the sale when the book value of the hospital was over $100,000,000 and an accounting firm had valued its fixed and intangible assets at $62,640,000–did not constitute a bona fide sale because the sale price for the assets did not equate to the cash and cash equivalents and it appropriately did not consider the value of promises of future services).

In this case, the Administrator stated that:

> the record shows that assets were transferred from the Provider to the surviving entity for the assumption of liabilities totaling approximately $13 million. The net book value of all the assets was listed as approximately $26,416,394.

> Of that amount, the current assets were listed as having a value of approximately $15,726,037 (and funded depreciation of $200,000). When certain deductions for bad debts, etc, are recognized, the current/cash assets are reduced from approximately $15 million to just under approximately $10,000,000 in current /cash assets. The Provider's land, non-monetary and depreciable assets were

listed as having an approximate net book value of $10,490,337. Using the cost approach, the fair market value of the land and depreciable assets was appraised at approximately $13,325,000. The Administrator finds that comparing the Provider's liabilities and the value of the Provider's transferred current/cash assets alone shows that the non-monetary assets (e.g., land, buildings, etc.) were transferred for approximately $3 million or approximately 1/3 of the net book value and less than 1/4 of the fair market value. This amount of consideration transferred (assumption of the debt) and the value of the assets received does not, in the Administrator's view, support a finding that the Provider transferred assets for reasonable consideration and as a result of a bona fide sale.

(A.R. 27.) The Administrator further stated that the fact that the parties did not secure an appraisal prior to the transaction was further indication that the providers were not concerned with receiving reasonable consideration for the depreciable assets and that they did not place the assets for sale on the open market to ascertain their worth, also indicating that there was no good faith bargaining to establish the fair market value of the assets as an ongoing concern before the transaction. (A.R. 28.)

Plaintiff argues that reasonable consideration was paid for the assets. It cites a report prepared by Valuation Counselors, which was submitted to the PRRB after the hearing. (A.R. 350-718.) Valuation Counselors assessed the assets at a fair market value of $3,000,000. (A.R. 354.) It argues that, given the value of the assumed liabilities recognized by the Administrator of approximately $13 million (A.R. 27), valuable consideration was delivered in connection with the transaction and that the Administrator erred in basing a decision on the consideration exchanged. It further argues that Mr. DeLuca testified regarding the correct method of calculating the revaluation amount due and that the FI did not provide any testimony, expert or otherwise, in this regard and even admitted that the Booth method is the best method of revaluation. (A.R. 729.) Mr. DeLuca testified that the most accurate and correct number due was $2,953,480, calculated in accordance with the Booth method. (A.R. 736-37, 1632-34.)

Finally, Plaintiff argues that the PRRB erred in requiring inclusion of an additional $3 million in consideration in loss calculation. These funds belonged solely to the Foundation and were not transferred to the Foundation from BMC in anticipation of the merger. (A.R. 101-03.)

Defendant responds that Plaintiff fails to carry its burden of proof. The record contains substantial evidence that the hospital (and $3 million from the Foundation) were transferred for the assumption of BMC's debt. The value of the transferred cash and equivalents exceeded that debt. (A.R. 27-29.) Similarly, the record shows that, ignoring cash and equivalents entirely, the appraised value of the hospital facility far exceeded the purported consideration. Thus, Plaintiff contends that BMC transferred either the cash and equivalents or the hospital facility to UPMC-Braddock for free. Defendant notes that the Court of Appeals has already upheld the Secretary's conclusion that the "sale" of a hospital for less than the value of its monetary assets is not bona fide. Lehigh Valley Hosp., 2007 WL 326303, at *4. It contends that, contrary to Plaintiff's allegations, the Administrator's decision is based upon a comparison of the monetary assets UPMC-Braddock received pursuant to the merger agreement with the assumed liabilities, not a comparison of book value to assumed liabilities. (A.R. 27-29.) It further argues that, if Plaintiff intends to suggest that the book value of its monetary assets, taken from audited financial statements submitted by plaintiff in an effort to substantiate its loss claim, is inaccurate, Plaintiff should have submitted accurate documents.

Alternatively, Defendant argues that the appraised value of Plaintiff's depreciable assets (which may or may not be more accurate than book value) was actually higher than the net book value. (A.R. 354.)

The Secretary's conclusion that the transaction was not a bona fide sale is supported by

substantial evidence in the record, including Plaintiff's appraisals. Therefore, it is entitled to deference. Plaintiff has not demonstrated that summary judgment in its favor is warranted. Defendant has demonstrated that summary judgment in its favor is appropriate.


s/Robert C. Mitchell
ROBERT C. MITCHELL
United States Magistrate Judge


Dated: September 29, 2008